AO 108 (Rev. 06/09, modified by USAO-DC) Application for a Warrant to Seize Property Subject to Forfeiture by Telephone

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Seizure of )
)
THE M/T SKIPPER WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9304667 ) Case No. 25-sz-50
)
)

## APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the jurisdiction of the District of Columbia is subject to forfeiture to the United States of America under 18 U.S.C. § 2339B(a)(1), 18 U.S.C. § 981(a)(1)(G)(i), 18 U.S.C. § 2332b(g)(5), 18 U.S.C. § 981(b)

*(describe the property)*:

the M/T SKIPPER (International Maritime Organization ("IMO") No. 9304667

The application is based on these facts:

SEE ATTACHED AFFIDAVIT, HEREBY INCORPORATED BY REFERENCE.

↨ Continued on the attached sheet.

Cindy R Burnham [signature]

*Applicant's signature*

Cindy Burnham, Special Agent and Benjamin Brown, Special Agent

*Printed name and title*

Attested to by the applicant in according with the requirements of Fed. R. Crim. P. 41 by telephone.

Date: 12/10/2025

*Judge's signature*

City and state: District of Columbia

Moxila A. Upadhyaya United States Magistrate Judge

*Printed name and title*

AO 109 (Rev. 12/09, modified by USAO-DC) Warrant to Seize Property Subject to Forfeiture by Telephone

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Seizure of

THE M/T SKIPPER WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9304667

Case No. 25-sz-50

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE BY TELEPHONE

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the jurisdiction of the District of Columbia be seized as being subject to forfeiture to the United States of America. The property is described as follows:

SEVEN VIRTUAL CURRENCY ADDRESS, FUTHER DESCRIBED IN ATTACHMENT A, HEREBY INCORPORATED BY REFERENCE.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before December 24, 2025 *(not to exceed 14 days)*

☐ in the daytime – 6:00 a.m. to 10:00 p.m.

☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge Moxila A. Upadhyaya, *(name)*.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for ______ days *(not to exceed 30)*.

☐ until, the facts justifying, the later specific date of ______.

Date and time issued: 12/10/2025

______________________
*Judge's signature*

City and state: District of Columbia

Moxila A. Upadhyaya, United States Magistrate Judge
*Printed name and title*

AO 109 (Rev. 12/09) Warrant to Seize Property Subject to Forfeiture (Page 2)

## Return

| Case No.: 25-sz-50 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of:

Inventory of the property taken:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF THE M/T SKIPPER WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 9304667** | **Case No. 25-sz-50**<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT**

I, Cindy Burnham, a Special Agent with Federal Bureau of Investigation, and Benjamin Brown, a Special Agent with Homeland Security Investigations, each being duly sworn, depose and state as follows:

## INTRODUCTION

1. I, Cindy Burnham, have been a Special Agent with the FBI since April 2006 and am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws. Since I started working for the FBI, I have been involved in national security investigations. Specifically, I have been involved in investigations involving counterintelligence, export and sanctions violations, and counterproliferation. During my work with the FBI, I have executed, or participated in the execution of, search warrants and have seized evidence of criminal violations. I have conducted and participated in other investigations related to violations of U.S. export laws and regulations and sanctions violations. I have been involved in investigations involving the illegal export of controlled items, as well as investigations involving the illegal use of the U.S. financial system to facilitate petroleum sales for the benefit of the Government of Iran and other designated entities.

2. I, Cindy Burnham, am serving as the case agent on this investigation, which FBI is conducting jointly with Homeland Security Investigations. I submit this affidavit based upon personal knowledge derived from my participation in this investigation, and information that I

have received from a variety of other sources, including law enforcement officers and agents, witness interviews, public records, bank records, and documents discussed herein. Because I am submitting this affidavit for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a seizure warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a seizure warrant.

3. I, Benjamin Brown, am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have served in this capacity since August 2020. I am currently assigned to the HSI, Washington, D.C., Counterproliferation Investigations group. My duties require me to enforce various federal laws, to include conducting investigations that relate to crimes involving export violations, sanctions violations, and counterproliferation. As a Special Agent of HSI, I have gained experience over the last four years in identifying and investigating such violations, and I have also received training in investigating such violations through the Federal Law Enforcement Training Center.

4. I, Benjamin Brown, am serving as a case agent on this investigation, in which HSI is conducting jointly with the Federal Bureau of Investigation. I submit this affidavit based upon personal knowledge gained from my participation in this investigation and my experience from similar investigations, as well as information that I have received from other sources, including relevant records and reports, witnesses, and law enforcement agents. Because I am submitting this affidavit for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a seizure warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a seizure warrant. The information obtained over the course of this

investigation has revealed that designated persons and entities are violating U.S. laws by trafficking in Iran-origin petroleum products for the benefit of the Islamic Revolutionary Guard Corps ("IRGC"),[1] including its Qods Force ("IRGC-QF"), which was designated a Foreign Terrorist Organizations ("FTO") by the United States Secretary of State on April 15, 2019 under Section 219 of the Immigration and Nationality Act. To date, the IRGC, including the IRGC-QF, remain a designated FTO.

**PURPOSE OF AFFIDAVIT**

5. The United States is seeking a renewed warrant to seize the M/T SKIPPER (International Maritime Organization ("IMO") No. 9304667 (the "SKIPPER" or the "Defendant Property"), which is currently located off the coast of Venezuela and is laden with approximately

---

[1] Also known as IRGC; Islamic Revolutionary Guards Corps; Islamic Revolution Guards Corps; Iran's Revolutionary Guard Corps; Islamic Revolutionary Corps; IRG; The Iranian Revolutionary Guards; Islamic Revolutionary Guards; Iran's Revolutionary Guards; Revolutionary Guards; Revolutionary Guard; Army of the Guardians of the Islamic Revolution; The Army of the Guardians of the Islamic Revolution; AGIR; Pasdaran; Pasdaran-e Inqilab; Pasdarn-e Enghelab-e Islami; Sepah; Sepah Pasdaran; Sepah-e Pasdaran-e Enghelab-e Eslami; Sepah-e Pasdaran Enghelab Islami; Islamic Revolutionary Guard Corps-Qods Force; IRGC-Quds Force; IRGC-QF; Qods Force; Sepah-e Qods; Jerusalem Force; Al Qods; Islamic Revolutionary Guard Corps (IRGC)-Qods Force; Pasdaran-e Enghelab-e Islami (Pasdaran); Sepah-e Qods (Jerusalem Force); Qods (Jerusalem) Force of the IRGC; Quds Force; IRGC Ground Forces; Islamic Revolution Guards Corps Ground Force; Basij; Baseej; Basij-e Melli; Islamic Revolution Guards Corps Resistance Force; Basij Resistance Forces; Mobilization of the Oppressed; Mobilization of the Oppressed Unit; Mobilization of the Oppressed Organization; Organization of the Mobilisation of the Oppressed; Sazman Basij Melli; Sazman-e Moghavemat-e Basij; Sazeman-e Basij-e Mostazafan; Vahed-e Basij-e Mostazafeen; Vahed-e Basij Mostaza'feen; National Mobilization Organization; National Resistance Mobilization; Resistance Mobilization Force; Nirooye Moghavemate Basij; Niruyeh Moghavemat Basij; IRGC Air Force; Islamic Revolution Guards Corps Air Force; Islamic Revolutionary Guards Corps Air Force; Islamic Revolutionary Guard Corps Air Force; IRGCAF; Sepah Pasdaran Air Force; Air Force, IRGC (Pasdaran); Islamic Revolutionary Guards Corps Aerospace Force; Aerospace Force of the Army of the Guardians of the Islamic Revolution; AFAGIR; Aerospace Division of IRGC; IRGC Aerospace Force; IRGCASF; IRGC Navy; Islamic Revolution Guards Corps Naval Force.

1.8 million barrels of Venezuela-origin crude oil. The SKIPPER has departed, or is expected shortly to depart, Venezuelan territorial waters.

6. On November 26, 2025, the Hon. Zia M. Faruqui issued a seizure warrant for the SKIPPER (Case No. 25-sz-50) (the "Prior Warrant"). Information from the government's Application for the Prior Warrant is reproduced below.

7. The government did not secure seizure of the SKIPPER within the 14-day window prescribed by the Prior Warrant because the SKIPPER did not proceed to the seizure location during the timeframe originally anticipated. The government understands that the next opportunity to execute the renewed seizure warrant is imminent.

8. As outlined in this affidavit, I believe there is probable cause to conclude that the Defendant Property affords the Iranian Ministry of Petroleum, the National Iranian Oil Company ("NIOC"), and the vessel's owner and its commercial and technical manager a source of influence over the IRGC, including the IRGC-QF, by transporting Iranian petrochemical products to generate revenue for the IRGC, in violation of 18 U.S.C. § 2339B(a)(1). We further believe there is probable cause to conclude that the Defendant Property provides its owner and its commercial and technical manager a source of influence over the Iranian Ministry of Petroleum and NIOC, which are the target of U.S. blocking sanctions and have engaged in a federal crime of terrorism – providing material support to the IRGC, an FTO. Thus, the Defendant Property is subject to both criminal and civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i).

## LEGAL AUTHORITIES

9. This application seeks a seizure warrant under both civil and criminal authorities because the Defendant Property consists of a transferrable oceangoing vessel that could easily be placed beyond process if not seized by a warrant.

10. Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for criminal forfeiture proceedings. Section 853(f) of Title 21 permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

## I. Terrorism Forfeiture Authorities

11. Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), "[a]ll assets, foreign or domestic … of any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization" are subject to forfeiture to the United States. Section 98l(a)(l)(G)(i) thus covers two categories of property: (1) all assets, foreign or domestic, of individuals, entities, or organizations engaged in planning or perpetrating federal crimes of terrorism; and (2) all assets, foreign or domestic, that afford any person a source of influence over an entity or organization engaged in planning or perpetrating any federal crime of terrorism. *See, e.g., United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, Civil Action No. 20-1791 (JEB), 2021 U.S. Dist. LEXIS 189395, at *12-13 (D.D.C. Oct. 1, 2021) ("The Court concludes, as a result, that Defendant Properties likely afforded Madanipour and Mobin a source of influence over the IRGC because those properties were critical to furthering the affairs of the terrorist group's enterprise. The Government thus properly brought this action for forfeiture against under 18 U.S.C. § 981(a)(1)(G)(i).") (citations omitted).

12. Among the government's forfeiture authorities, the terrorism forfeiture provision applies to the broadest range of property. Specifically, Section 981(a)(1)(G)(i) provides for the forfeiture of *all* property, foreign or domestic, of a terrorist organization or that affords a source of influence to any entity or organization over a terrorist organization, irrespective of whether the property has any nexus to a crime or to the United States. *See, e.g., United States v. One Gold Ring with Carved Gemstone*, Civil Action No. 16-CV-02442-TFH, 2019 U.S. Dist. LEXIS 195423, at *1-2 (D.D.C. Nov. 7, 2019) ("§ 981(a)(1)(G)(i) covers all property 'foreign or domestic.' That is, the statute empowers the government to seek the forfeiture of property outside the United States, which may have never touched the United States. The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations.").

**II. Jurisdiction and Venue**

13. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1355(a), which provides that [t]he district courts shall have original jurisdiction … of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress . . . ." This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States."

14. This Court has *in rem* jurisdiction over the Defendant Property and venue lies in this Court pursuant to 28 U.S.C. § 1355(b)(2), which provides that "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought … in the United States District Court for the District of Columbia." *See, e.g., One Gold Ring with Carved Gemstone*, 2019 U.S. Dist. LEXIS 195423, at

*2 ("This court is the sole jurisdiction where such litigation is properly lodged. 28 U.S.C. § 1355(b)(2)."). To the extent that the Defendant Property is seized upon the high seas, this Court additionally has jurisdiction pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b). *See, e.g., United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. 20-1791, 2020 U.S. Dist. LEXIS 120727, at *2 (D.D.C. July 2, 2020) ("WHEREAS, this Court has venue and jurisdiction over the Defendant Properties: (i) as they are located in a foreign country or have been detained by a foreign authority, pursuant to 28 U.S.C. § 1355(b)(2); and/or (ii) as they are on the high seas, pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b)[.]").

## PROBABLE CAUSE

15. As described further herein, the Defendant Property has been used to transfer millions of barrels of Iran-origin crude oil from Iran, and such transfers were facilitated by entities supporting or working for the benefit of the IRGC, an FTO.

### III. Relevant Entities

#### a. Government of Iran

16. On January 19, 1984, the United States designated Iran as a state sponsor of terrorism. *See* https://www.state.gov/reports/country-reports-on-terrorism-2023/. For 2023, the most recent year for which Country Reports on Terrorism are available, the State Department concluded that "Iran continued its support for terrorist activity in 2023, including support for Hizballah, U.S.-designated Palestinian terrorist groups in the West Bank and Gaza including Hamas, the Houthis in Yemen, and Iran-aligned militia groups (IAMGs) in Iraq and Syria." *Id.* The State Department further found that "Iran used the Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region," and that "the IRGC-QF is Iran's primary

mechanism for cultivating and supporting terrorist activity abroad." *Id.* To date, the United States has not delisted Iran as a state sponsor of terrorism. *See* https://www.state.gov/state-sponsors-of-terrorism/.

**i. Iranian Ministry of Petroleum**

17. According to the Iranian Ministry of Petroleum's website, the ministry "is a state-run organ affiliated with the Executive branch of government" that was established in 1979. https://en.mop.ir/home/. The ministry reports that it "is tasked with exercising the principle of Iran's ownership of and national sovereignty over oil and gas resources as well as separating governance from administrative tasks in the development of oil and gas industry." *Id.* The ministry exercises its authority over the petroleum industry through four subsidiaries – NIOC, the National Iranian Gas Company, the National Iranian Oil Refining and Distribution Company, and the National Petrochemical Company. *Id.* ("The structural organization of the Ministry comprises a head office and four main subsidiaries – National Iranian Oil Company (NIOC), National Iranian Gas Company (NIGC), National Iranian Oil Refining and Distribution Company (NIORDC) and National Petrochemical Company (NPC). Through subsidiaries, the Ministry supervises exploration, extraction, marketing and selling of crude oil, natural gas and petroleum products in the country.").

18. The Iranian government's ownership of petroleum resources stems from Articles 44 and 45 of Iran's constitution. Article 44 provides in part: "The economy of the Islamic Republic of Iran is to consist of three sectors: state, cooperative, and private, and is to be based on systematic and sound planning. The state sector is to include all large-scale and mother industries, foreign trade, major minerals, banking, insurance, power generation, dams and large-scale irrigation networks, radio and television, post, telegraph and telephone services, aviation, shipping, roads,

railroads and the like; all these will be publicly owned and administered by the State." https://www.constituteproject.org/constitution/Iran_1989.pdf?lang=en.[2] Article 45 provides in part: "Public wealth and property, such as uncultivated or abandoned land, mineral deposits, seas, lakes, rivers and other public water-ways, mountains, valleys, forests, marshland, natural forests, unenclosed pastureland, legacies without heirs, property of undetermined ownership, and public property recovered from usurpers, shall be at the disposal of the Islamic government for it to utilize in accordance with the public interest." *Id.*

19. Article 2 of Iran's Oil Law (Sep. 30, 1987) provides: "The country's oil resources are part of the Anfal and public wealth, and according to Article 45 of the Constitution, is at the disposal of the Islamic government, and all facilities, equipment, assets and investments that have been or will be made by the Ministry of Oil and subsidiaries at home and abroad will belong to the Iranian people and to the Islamic government. The exercise of sovereignty and ownership of oil resources and facilities belongs to the Islamic Government, which according to the provisions and powers enumerated in this law, it is the responsibility of the Ministry of Oil to act in accordance with the general principles and plans of the country." https://en.mop.ir/portal/home/?news/368984/368988/379478/petroleum-law

20. On October 26, 2020, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated the Iranian Ministry of Petroleum under Executive Order 13224 for providing financial support to the IRGC-QF, meaning the Ministry of Petroleum was added to OFAC's Specially Designated Nationals and Blocked Persons ("SDN") List. *See* https://home.treasury.gov/news/press-releases/sm1165. OFAC found that "[t]he Iranian Ministry

---

[2] The Constitution of the Islamic Republic of Iran was adopted and went into force in 1979. It has been amended once, on July 28, 1989.

of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme." *Id.* OFAC enforces and administers economic sanctions to accomplish U.S. national security and foreign policy goals. In addition to comprehensive sanctions programs, such as the sanctions imposed on Iran, OFAC enforces and administers list-based sanctions programs targeting specific individuals and entities and maintains a publicly available list of such individuals and entities, one of which is the SDN List. When an individual or entity is identified by OFAC on the SDN List, their property and interests in property, subject to U.S. jurisdiction or in the possession or control of U.S. persons, are blocked. As a result, U.S. persons, including U.S. financial institutions, are generally prohibited from dealing with individuals designated as Specially Designated Global Terrorists ("SDGTs") or SDNs and their property and interests in property absent authorization from OFAC.

**ii. Islamic Revolutionary Guard Corps**

21. The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system. The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations.

22. The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking." https://home.treasury.gov/news/press-releases/tg1718. According to OFAC, "[t]he IRGC and its major holdings, such as the Basij Cooperative Foundation and Khatam al-Anbiya, have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses." https://home.treasury.gov/news/press-releases/sm703.

23. The IRGC, including the IRGC-QF, use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iran-origin oil. Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries … to obfuscate its involvement in selling Iranian oil." https://home.treasury.gov/news/press-releases/sm767; *see also* https://home.treasury.gov/news/press-releases/tg1718 ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies."). The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC." *See* https://home.treasury.gov/news/press-releases/sm703.

24. The IRGC generates substantial revenues from the sale of petroleum products. For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars." https://home.treasury.gov/news/press-releases/sm767.

25. The IRGC uses the proceeds from the distribution of petroleum to fund its terror activities. OFAC has found that: "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East." https://home.treasury.gov/news/press-releases/sm885; *see also* https://home.treasury.gov/news/press-releases/sm703 ("The profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a

variety of human rights abuses, at home and abroad."). The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." https://home.treasury.gov/news/press-releases/sm885.

26. On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm. In part, OFAC found that "[t]he Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)." *Id.* On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/sm0177.

27. On April 8, 2019, the President announced that he would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189). *See* https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/. The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with the IRGC, you will be bankrolling terrorism." *Id.* On April 8, 2019, the State Department similarly announced the pending designation of the IRGC, including the IRGC-QF. *See* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html. That

announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." *Id.*

28. On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA. *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

**iii. National Iranian Oil Company**

29. NIOC is the national oil company of Iran and a subsidiary of the Iranian Ministry of Petroleum. NIOC describes itself as "one of the largest oil firms in the world with huge hydrocarbon reserves." https://en.nioc.ir/en-US/en.nioc/5696/page/NIOC-at-a-Glance. NIOC reports that it is "responsible for organizing and policy-making activities of the oil industry, including exploration, drilling, production, research and development, as well as oil and gas exports." *Id.*; *see also* https://home.treasury.gov/news/press-releases/sm1165 ("NIOC, overseen by the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran."). According to OFAC, the distribution of NIOC oil "helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies." https://home.treasury.gov/news/press-releases/sm885.

30. On September 24, 2012, the Department of the Treasury reported to Congress that it had determined that NIOC was an agent or affiliate of the IRGC. *See* https://home.treasury.gov/news/press-releases/tg1718. On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13224 "for having materially assisted, sponsored, or provided

financial, material, or technological support for, or goods or services in support of, the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165.

**iv. Iranian Oil Terminals Company**

31. The Iranian Oil Terminals Company ("IOTC") is a subsidiary of NIOC that operates the Kharg Oil Terminal at Kharg Island, Iran. *See* https://en.nioc.ir/en-US/en.nioc/5699/page/Subsidiaries (listing IOTC as a subsidiary); *see also* https://www.iotco.ir/en/aboutus/introductioncompany (stating that IOTC is "one of the companies under [the] umbrella of [the] National Iranian Oil Company"). IOTC describes itself as "an operational, specialized and professional organization that has the duty of all reservation affairs, crude oil, oil products, liquefied gas and marine services export and import operations along with providing measurement and lab services." *Id.* According to IOTC, its responsibilities include "support and sustained continuation of oil and gas production in the country in four operational zones of Kharg Oil Terminals." *Id.* According to Orbis, a corporate reporting service, the government of Iran is the "global ultimate owner" of IOTC.

**v. Kharg Oil Terminal**

32. Kharg Oil Terminal is an oil terminal located at Kharg Island, Iran that is operated by IOTC. The terminal has quays or jetties for loading petroleum onto crude oil tankers. *See* https://www.iotco.ir/en/oilterminals/kharg.

33. According to IOTC's website, Kharg Oil Terminal receives oil via pipeline from Iran's South Oilfields, which are operated by the National Iranian South Oil Company ("NISOC"). *See id.*

**vi. National Iranian South Oil Company**

34. According to NISOC's LinkedIn page, "National Iranian South Oil Company (NISOC) . . . is a government-owned corporation under the direction of the Ministry of Petroleum of Iran and operates as a subsidiary of National Iranian Oil Company." *See also* https://en.nioc.ir/portal/home/?generaltext/81026/81171/168449/ (listing NISOC as a subsidiary of NIOC).

**b. M/T SKIPPER**

35. The M/T SKIPPER (IMO 9304667) is a crude oil tanker built in 2005. It flies the flag of Guyana, but according to information provided by the U.S. Embassy in Georgetown, Guyana, the vessel is not legitimately flagged in Guyana. Thus, it is flying a false Guyanese flag and is considered stateless. Further, since at least in or around May 2024, several news organizations reported that an unauthorized entity was falsely registering Iran-linked vessels under the Guyana flag as an obfuscation tactic. *See* https://www.lloydslist.com/LL1149046/Guyana-raises-rogue-registry-warning-as-sanctioned-tankers-falsely-fly-its-flag (Guyanese maritime authority tells United Against Nuclear Iran that more than a dozen tankers linked with Iran were fraudulently registered under its flag by an unauthorized entity). The same scenario appears to be present in the instant situation involving the SKIPPER. We know from my training and experience that vessels involved in evading sanctions and moving Iran-oil for the benefit of the IRGC frequently fly false flags in this way, in part because many countries that maintain reputable flag registries will not allow such vessels to register and fly their flags.

36. Both the SKIPPER and its registered owner, Marshall Islands-based Triton Navigation Corp, were designated by OFAC on November 3, 2022, as a part of Viktor Artemov's sanctions evasion network, which according to OFAC, worked in support of the IRGC-QG and

Hizballah. OFAC blocked the SKIPPER (then named the M/T ADISA) as property in which Artemov has an interest.

37. We have reviewed evidence reflecting that Artemov and another individual with an interest in the Defendant Property discussed potentially receiving a valuation for the Defendant Property in or about September 2023. We know from my training and experience that valuations are often performed when owners are considering selling a vessel. Regardless of Artemov's sale of the Defendant Property, which may have occurred in or around early 2024, as discussed herein, an analysis of satellite imagery reflects that the new owner of the Defendant Property continued using the Defendant Property, which remained (and still remains) blocked property, to ship Iranian oil, for the benefit of the IRGC.



*The SKIPPER, located in the anchorage of José Terminal, Venezuela, on or about October 30, 2025*

**c. Automatic Identification System Spoofing**

38. Based on my training and experience, we know that location "spoofing" is a deceptive shipping practice that involves tampering with the vessel's Automatic Identification System ("AIS"), a tool used to broadcast vessel position, vessel identity, and other critical information to nearby vessels and maritime authorities, initially used for collision avoidance.

39. Based on my training and experience, we know AIS spoofing involves the deliberate falsification of AIS messages, misleading vessels and maritime authorities about a ship's true location and identity, a potential illicit activity. This can be done by transmitting false AIS data or altering legitimate ones. By manipulating AIS transmissions, malicious actors, especially tankers operators, can create "ghost ships," obscure true vessel movements, or simulate fleet movements, creating significant security vulnerabilities. We know from my training and experience that spoofing is a method regularly deployed by individuals and entities involved in shipping illicit oil, including Iran-origin oil for the benefit of the IRGC, as spoofing makes it more difficult to detect an oil shipment's origins.

40. A data and analytics company that provides real-time intelligence on global commodity and shipping markets reports that the SKIPPER exhibited multiple AIS spoofing incidents between 2024 and 2025. These include repeated falsified transmissions within the Persian Gulf region (Iran–Iraq) and Gulf of Guinea (Ghana–Nigeria), as well as anomalous signal activity between Egypt and the Mediterranean Sea. We know from my training and experience that the recurrence and geographic spread of spoofing events likely indicate deliberate obfuscation of voyage routes and/or sanctions evasion-related concealment patterns.

## IV. Venezuela Oil Exports

41. According to a confidential human source ("CHS")[3], the SKIPPER has a history of exporting crude oil from the José Terminal in Venezuela, which is owned and operated by Petróleos de Venezuela, S.A. ("PdVSA") and its subsidiaries. PdVSA is the Venezuelan state-owned oil

[3] From 2021 to the present, this CHS and the CHS's company have been paid approximately $510,000 for time and professional services in this and related investigations. The United States has additionally reimbursed the CHS for travel costs incurred in related investigations.

company, which was designated by OFAC in January 2019 as an SDN pursuant to E.O. 13850. According to OFAC, PdVSA is a primary source of Venezuela's income and foreign currency (including U.S. dollars) and "has long been a vehicle for corruption," allowing the Maduro regime to embezzle billions of dollars from PdVSA for the personal gain of corrupt Venezuelan officials and businessmen. *See* https://home.treasury.gov/news/press-releases/sm594. Multiple examples of the SKIPPER loading Venezuela oil are discussed below.

42. In or around May 2021, the SKIPPER loaded approximately 1.9 million barrels of crude oil from the José Terminal.



*SKIPPER loading at the José Terminal on or about May 5, 2021*

43. On or about March 14, 2022, the SKIPPER loaded approximately 1.8 million barrels of crude oil from the José Terminal, Venezuela. The SKIPPER transferred the oil via ship-to-ship ("STS") transfer to the VIGO (IMO 9208136) near Melaka, Malaysia. We know from my training and experience that STS transfers can be used to obscure the origin of petrochemical products to evade sanctions and other laws and regulations.



*Satellite image of the SKIPPER near José Terminal, Venezuela on or about March 13, 2022*

**V. Multiple SKIPPER loadings at Kharg Oil Terminal**

44. According to the CHS, in the past two years, the SKIPPER has loaded more than seven million barrels of Iran-origin crude oil – worth hundreds of millions of dollars – from Kharg Island, Iran, most recently in or around July 2025.

45. On or about February 6, 2024, the vessel M/T DERYA (IMO 9569700), an OFAC-designated oil tanker owned and operated by the sanctioned National Iranian Tanker Company ("NITC"), loaded two million barrels of crude oil from Kharg Island, Iran.



*DERYA loading from Kharg Island on or about February 6, 2024*

46. On or about February 26, 2024, the SKIPPER received the two million barrels of crude oil from the DERYA via an STS transfer that took place west of Kharg Island.



*DERYA transfers cargo to SKIPPER on or about February 26, 2024*

47. On or about March 3, 2024, the SKIPPER engaged in an STS transfer with the M/T ANNA (IMO 9233208) to transfer approximately 550,000 barrels of the Iran-origin crude oil to the ANNA. On or about November 3, 2022, as a part of the Artemov designation, OFAC identified the ANNA (then named the M/T RAIN DROP) as property in which a blocked person has an interest. On or about March 5, 2024, the SKIPPER delivered the remaining 1.45 million barrels to Baniyas, Syria, which at the time was a jurisdiction subject to comprehensive U.S. sanctions.



*SKIPPER transfers cargo to ANNA on or about March 3, 2024*

48. According to the CHS, in or around July 2024, the SKIPPER delivered approximately 1.94 million barrels of crude oil from Kharg Island, Iran to Baniyas, Syria. On or about July 21, 2024, the SKIPPER transferred part of her cargo via STS transfer to the M/T VERONICA (IMO 9256860) in the anchorage area of Larak Island, Iran before continuing on to Syria. The VERONICA is a sanctioned oil tanker flying a false Guyanese flag. OFAC designated the VERONICA on or about February 22, 2022, under its prior name, the M/T PEGAS, for being property of PSB Lizing OOO, a designated subsidiary of Russia-based Promsvyazbank ("PSB"). The VERONICA is currently engaging in ghost/shadow fleet[4] activity off the coast of Venezuela, where it has engaged in multiple STS transfers with other designated ghost/shadow fleet vessels.

[4] Vessels engaged in illicit oil shipment activity and violating U.S. sanctions often are referred to as comprising the international "Ghost Fleet."



*SKIPPER STS with VERONICA near Larak Island, Iran anchorage on or about July 21, 2024*

49. According to satellite imagery reviewed by the CHS, on or about February 5, 2025, the SKIPPER loaded approximately 1.88 million barrels of crude oil from Kharg Island, Iran.



*SKIPPER at anchorage in Kharg Island, Iran on or about January 30, 2025*

50. According to satellite imagery reviewed by the CHS, on or about July 7, 2025, the SKIPPER loaded approximately 1.95 million barrels of crude oil from Kharg Island, Iran. The oil was delivered to the M/T LUOIS (IMO 9312494) via STS transfer near Hong Kong.



*SKIPPER at anchorage in Kharg Island, Iran on or about July 7, 2025*

## VI. Defendant Property is Subject to Forfeiture

51. As outlined above, there is probable cause to conclude that the OFAC-blocked SKIPPER loaded Iran-origin petroleum at the Kharg Oil Terminal and received Iran-origin crude oil from Kharg Island via STS transfer on at least four occasions in 2024 and 2025. There is also probable cause to believe that the SKIPPER will continue transporting Iran-origin oil for the benefit of the IRGC, an FTO, after offloading its current cargo of Venezuela-origin oil, as demonstrated by its past history.

52. There is also probable cause to believe that NIOC and its subsidiaries own and operate the Kharg Oil Terminal and owned the petroleum that was loaded onto the SKIPPER and its various feeder vessels at the terminal. OFAC has designated both the Iranian Ministry of Petroleum and NIOC for providing material support to the IRGC, an FTO. The Defendant Property provides NIOC with a source of influence over the IRGC, including the IRGC-QF, within the meaning of 18 U.S.C. § 981(a)(1)(G)(i), because the Defendant Property was critical to furthering IRGC-QF's enterprise and profits.

53. This Court has previously found that the IRGC depends on proceeds generated from petroleum sales to fund its terrorist activities. *See All Petroleum-Product Cargo Aboard the Bella*,

2021 U.S. Dist. LEXIS 189395, at *12 ("Indeed, the profits from Iran's oil industry are its 'financial lifeline.'"). According to OFAC, the IRGC relies on a network of front companies and shipping companies to ship the oil and to obscure its involvement in the sales, and the Secretary of the Treasury has stated that such companies provide a "financial lifeline" to the IRGC. Accordingly, the Defendant Property affords a source of influence to the IRGC, the Iranian Ministry of Petroleum, and NIOC, by providing a means to ship the IRGC's oil to its buyers. *See id.* at *12-13 ("The Court concludes, as a result, that Defendant Properties likely afforded Madanipour and Mobin a source of influence over the IRGC because those properties were critical to furthering the affairs of the terrorist group's enterprise.").

54. There is probable cause to believe that the Defendant Property is a source of influence over the Iranian Ministry of Petroleum and NIOC, entities that engaged in federal crimes of terrorism – *i.e.*, providing material support to an FTO, namely the IRGC, including the IRGC-QF – and thus the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(l)(G)(i).

55. Additionally, the Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), because it provides the third-party companies who own, charter, and manage the vessel a source of influence over NIOC, which is a designated entity that has engaged in a federal crime of terrorism – *i.e.*, providing material support to an FTO, namely the IRGC, including the IRGC-QF.

**THE CURRENT VENEZUELAN CARGO**

56. As described above, we believe there is probable cause to support the seizure of the SKIPPER. At present, we do not know the owner of its current cargo, consisting of approximately 1.8 million barrels of Venezuela-origin crude oil from PdVSA, nor are we submitting that there is probable cause to seize the cargo at this time. Therefore, upon executing the seizure of the

Defendant Property, the government intends to take all reasonable steps to identify the owner of the cargo and the circumstances surrounding the transaction at or around the time of the SKIPPER's seizure, and either seek a seizure warrant for the cargo or take reasonable steps – in all cases consistent with U.S. law – to engage with the owner(s) once identified to return the property or otherwise reach an agreement with respect to it.

## CONCLUSION

57. We respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this renewed Application for a Seizure Warrant. In support of this request, we inform the Court that we are currently working on the investigation of this and other matters. If we were required to appear before the Court in person, it would be a cost to the United States both in travel costs and time diverted from the substantive investigation. We submit that staff from the U.S. Attorney's Office are capable of identifying our voices and telephone numbers for the Court.

58. Based on security concerns raised by the nature, ownership, and location of the Defendant Property, there exists reasonable cause to permit the execution of the requested warrant at any time of day or night.

59. Based on the information contained herein and my training and experience, we submit that the Defendant Property is subject to seizure and forfeiture, pursuant to the above referenced statutes, and we request that the Court issue the proposed renewed seizure warrant.

Respectfully submitted,

Cindy R Burnham

Cindy Burnham, Special Agent
Federal Bureau of Investigation

Benjamin Brown, Special Agent
Homeland Security Investigations

Attested to by the applicants in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on December 10, 2025.

HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE